UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| TRANSPORTATION INSURANCE COMPANY, | : : : | Case No. 1:11-cv-907 |
| Plaintiff, | : : | Judge Timothy S. Black |
| vs. | : : | |
| BUSY BEAVER BUILDING CENTERS, INC., | : : : | |
| Defendant. | : | |

**ORDER: (1) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Doc. 45); AND (2) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 44)**

This civil action is before the Court on the parties' cross-motions for summary judgment (Docs. 44, 45) and responsive memoranda (Docs. 50, 51, 52, 53).

## I.  BACKGROUND FACTS

This civil action centers on a dispute between an insurer and a named insured for premiums due and owing for insurance coverage.  Plaintiff provided insurance coverage for dozens of asbestos lawsuits brought against Defendant, a named insured under polices of insurance issued by Plaintiff.  The parent company with whom the insurance contracts were formed more than thirty years ago is no longer operational nor available to pay.  Defendant refuses to remit payment of the premiums, claiming that it has no such contractual obligations to Plaintiff.

Liability and damages in this matter have been bifurcated.  (Doc. 20).  Both parties move for summary judgment on the issue of liability.

## II. PLAINTIFF'S UNDISPUTED FACTS[1]

1. Plaintiff Transportation Insurance Company ("Transportation") issued policies of workers' compensation and general liability insurance to Cyclops Corporation ("Cyclops") and certain Cyclops subsidiaries as follows: (a) Policy Nos. WC005397241, WC005397242, CCP005309614, CCP005309635 and CCP005309615 for the three-year term with effective dates of July 1, 1979 to July 1, 1982; (b) Policy Nos. WC006860162, WC006860163 and CCP001359271 for the three-year term with effective dates of July 1, 1982 to July 1, 1985; (c) Policy Nos. WC001702394, WC001702398 and CCP001702406 for the effective dates of July 1, 1985 to July 1, 1986; and (d) Policy Nos. WC001702394, WC001702398 and CCP001702406 for the effective dates of July 1, 1986 to July 1, 1987.  These insurance policies are hereinafter referred to as "the Policies."  (Doc. 48 at ¶ 4).[2]

2. The Policies, by their terms, are subject to retrospective rating plans.  Pursuant to the terms of the Policies, the insured's premium obligations are based on, *inter alia*, payments and reserves on claims submitted for coverage under the Policies. (Doc. 48 at ¶ 5).[3]

3. The Programs provide for annual calculations of the amounts owed to Transportation for retrospective premiums.  Pursuant to the terms of the Programs, these annual calculations are performed with incurred losses (i.e. payments and reserves on claims submitted for coverage under the Policies) valued as of the first day of January and continue from year to year until either all claims submitted for coverage under the Policies have closed or the maximum premium amount is reached.  These annual calculations of the retrospective premiums are referred to as "Rating Plan Adjustments."  (Doc. 48 at ¶ 7).[4]

---

[1]  *See* Doc. 46, Ex. 1 and Doc. 50.

[2]  Defendant claims that only the general liability policies (prefix CCP) are material to the motion.

[3]  Defendant admits that the Policies are subject to retrospective rating plans and that a rating plan would operate as generally described.  However, Plaintiff contends that the Policies and Confirmation Letters outline the terms of the program.  (Doc. 35 at ¶¶ 11-12).

[4]  Defendant admits that this is how the restrospective rating program should work, but denies that Plaintiff actually made the calculations on an annual basis.  Defendant claims that between 2005-2009, Plaintiff did not perform the annual calculations and Plaintiff sent nothing to Defendant until 2011.  (Doc. 44, Ex. B at 20-22, 64-65, 67-70).

4. The specific policies among the Policies at issue are the policies of general liability insurance issued to Cyclops and its subsidiaries, namely: (a) Policy No. CCP005309614 for the three-year term with effective dates of July 1, 1979 to July 1, 1982; (b) Policy No. CCP001359271 for the three-year term with effective dates of July 1, 1982 to July 1, 1985, and (c) Policy No. CCP001702406 for the effective dates of July 1, 1985 to July 1, 1986.  These policies of insurance are hereinafter referred to as "the GL Policies."  (Doc. 48 at ¶ 8).

5. Each of the GL Policies contains a Named Insured Endorsement which clearly states that the "Named Insured" is defined as follows:

Cyclops Corporation and any business entity incorporated or organized under the laws of the United States of America, including any state thereof, territory or possession, or Canada, including any province thereof, while the organization named in Item 1 of the Declarations owns during the policy period a majority interest.

6. Each of the GL Policies is subject to an Automatic Premium Adjustment Rating Plan Endorsement (more commonly known in the industry and hereinafter referred to as the "Retro Endorsement").  The Retro Endorsements set forth the contractual obligations related to the retrospective premiums including the obligations of the Named Insured. Relevant to the issues before the Court, Section 4 of the Retro Endorsements makes the Named Insured responsible for payment of retrospective premiums. Specifically, the Retro Endorsements provide as follows: "After each computation [of adjusted premium], if the premium thus computed exceeds the premium paid for insurance subject to the Plan, the named insured shall pay the difference to the Company; if less, the Company shall return the difference to the named insured."  (Doc. 48 at ¶¶ 13-18).[5]

7. Based on information and belief, Cyclops sold, divested and/or merged its various subsidiaries, operations, divisions and/or business units over a period of several years.  (Doc. 48 at ¶ 19).[6]

---

[5] Defendant admits the existence of a Retro Endorsement in the uncertified Policies and that Plaintiff has quoted an excerpt of that Endorsement.  As a matter of law, however, Defendant denies the Endorsement's application to Defendant in respect to the responsibility for premium payments.

[6] Defendant admits that Cyclops sold all of its stock in Busy Beaver in 1988 pursuant to a Stock Purchase Agreement.  Defendant is not aware of Cyclop's subsequent business dealings.

8.  Defendant Busy Beaver Building Centers, Inc. ("Busy Beaver") was a wholly-owned subsidiary of Cyclops during the effective dates of the GL Policies.  (Doc. 47 at ¶ 3, Ex. A at 27; Doc. 47 at ¶ 4, Ex. B at 3).

9.  Busy Beaver admits that it was a Named Insured under the GL Policies and that it did not maintain any separate insurance apart from Cyclops.  (Doc. 47 at ¶ 4, Ex. B at 2; Doc. 47 at ¶ 3, Ex. A at 27-28).

10. Busy Beaver was obligated to remit a fee to Cyclops for, *inter alia*, insurance, including the GL Policies.  (*See* Doc. 47 at ¶ 3, Ex. A at 29-30, 31-32). [7]

11. Busy Beaver became a stand-alone corporation in 1988, and has been ever since.  (Doc. 47 at ¶ 3, Ex. A at 20-21).

12. Busy Beaver was and is fully familiar with loss sensitive insurance programs and retrospectively rated insurance programs.  (Doc. 47 at ¶ 5, Ex. C at 20-21). [8]

13. DeMao has been employed by Busy Beaver since 1995 in the position of Vice President of Administration and Chief Financial Officer.  (Doc. 47 at ¶ 5, Ex. C at 11).

14. In approximately 2003, Busy Beaver received notice that it was being sued for asbestos-related claims.  Busy Beaver had Grogan Graffam, P.C., its outside legal counsel, investigate and determine Busy Beaver's insurance coverage for asbestos-related lawsuits.  Grogan Graffam, P.C. identified Busy Beaver as a Named Insured under the GL Policies.  (*See* Doc. 47 at ¶ 5, Ex. C at 24 -25, 27-28, 30, 32).

---

[7] Defendant generally admits this fact, but adds more specificity as follows.  Cyclops required its divisions and subsidiaries to pay a management fee for various services, including legal support, human resources and insurance.  The amount of the fee was determined by Cyclops in advance of the fiscal year.  The details of how that fee was derived were not clear to Defendant and the invoiced amount was not broken down beyond the lump sum due.  (Doc. 44, Ex. D at 29-33).

[8] Defendant admits that it has a general familiarity with the concept of a restrospective insurance program.  To the extent Plaintiff suggests that Defendant was "fully familiar" with the specific retrospective programs at issue in this case, Defendant claims it had no input or involvement in procuring the specific programs at issue in this case.  (Doc. 44, Ex. D at 29-34).  Plaintiff admits having no communications with Defendant during the underwriting of the Policies.  (*Id*., Ex. B at 23).

15. Busy Beaver has copies of the GL Policies and had the opportunity to review them.  Busy Beaver, however, only performed a "very limited" review and deferred to Grogan Graffam, P.C. for its interpretation of the GL Policies.  (Doc. 47 at ¶ 5, Ex. C at 38-39).[9]

16. Busy Beaver, as a Named Insured under the GL Policies, requested and received insurance coverage under the GL Policies for asbestos-related claims.  (Doc. 47 at ¶ 4, Ex. B at 3; Doc. 47 at ¶ 5, Ex. C at 32-33; Doc. 48 at ¶ 21).

17. Busy Beaver demanded, received and continues to receive insurance coverage under the GL Policies based on its status as a Named Insured under the Policies by virtue of having been wholly-owned subsidiary of Cyclops during the effective dates of the Policies.  (Doc. 48 at ¶ 22).

18. At the time Busy Beaver requested and received coverage under the Policies, it knew that it was no longer owned by Cyclops.  (*See* Doc. 47 at ¶ 5, Ex. C at 40-41).

19. At the time Busy Beaver requested and received coverage under the GL Policies, it knew that it no longer had any financial dealings with Cyclops, Silo, AK Steel or Armco.  (*Id.*)

20. Busy Beaver understands that insurance policies are contracts.  (Doc. 47 at ¶ 5, Ex. C at 33, 50).

21. Transportation has not been paid any portion of the retrospective premiums generated by payments and reserves specifically attributable to and necessitated by asbestos claims submitted for coverage by Busy Beaver.  (Doc. 48 at ¶ 26).[10]

---

[9] Defendant admits that it presently has copies of the Polices, although they have not been certified by Plaintiff.  (Doc. 44, Ex. B at 27).

[10] Defendant admits that it has not made payment.  Defendant is unaware of whether Plaintiff was paid by AK Steel Corporation or any other entity because no discovery on the damages phase of the case has been undertaken and Plaintiff has not yet provided Defendant with the settlement agreement entered into between Plaintiff and AK Steel Corporation.

### III.    DEFENDANT'S UNDISPUTED FACTS[11]

1. Plaintiff Transportation Insurance Company issued occurrence based commercial general liability insurance to Cyclops Corporation and its subsidiaries.  The first set of policies spanned from July I, 1979 to July 1, 1982, the second set from July I, 1984 to July I, 1985, the third set from July 1, 1985 to July I, 1986, and the final set from July I, 1986 to July I, 1987 (collectively "the Policies" ) (Doc. 35 at ¶ 8; Doc. 44, Ex. A).

2. At the time the Policies were entered into, Busy Beaver was a wholly owned subsidiary of Cyclops.  (Doc. 44, Ex. C at 11-12).

3. During the early Policy years, Cyclops paid all monthly interim installment premiums.  (Doc. 44, Ex. B at 52).

4. The Policies were intended to be accompanied by executed Confirmation Letters, which further outlined the terms of the Policies, including the retrospective premium adjustment program.  (Doc. 44, Exs. F-I).

5. Plaintiff has not produced any signed and/or executed Confirmation Letters.  (Doc. 44, Exs, F-I; Ex. B at 27).

6. The Policies produced by Plaintiff have not been certified.  (Doc. 44, Ex. B at 27).[12]

7. In 2009, Plaintiff unilaterally reallocated the losses and spread them over years of the Policies that had yet to reach the maximum premium threshold.  (Doc. 44, Ex. B at 20).

8. Plaintiff did not notify Busy Beaver of its reallocation.  (Doc. 44, Ex. B at 22).

9. Plaintiff did not send any premium adjustment information to Busy Beaver, even after Busy Beaver requested such information.  (Doc. 44, Ex. K).

---

[11] *See* Doc. 49 and Doc. 51, Ex. 1.

[12] Plaintiff admits this fact but states that Defendant has had possession of the policies and has had the policies reviewed by counsel who opined on coverage.  (Doc. 47 at ¶ 9; Doc. 44, Ex. H at 30-33, 38-39).  Throughout this litigation, Defendant has not identified any errors or omissions in the GL Policies

10. Plaintiff did not send any premium adjustment information or a demand for payment to Busy Beaver after reallocating in 2009.  (Doc. 44, Ex. B at 70).

11. Plaintiff performed similar adjustments in 2010 and 2011.  (Doc. 44, Ex. B at 76-78; Exs. M-N, P).

12. Prior to September of 2011, Plaintiff did not send any of the adjustment information or a demand for payment to Busy Beaver.  (Doc. 44, Ex. B at 76-78).

13. Once rating plan adjustments were performed, TIC generated invoices and addressed them to Cyclops.  (Doc. 44, Ex, B at 70; Exs. L-O).

14. Payment on these invoices became due 30 days after the invoices were generated.  (Doc. 44, Exs. L-O).

15. For each year, the payment of retrospective premiums became due in the particular year the invoice was generated.  (Doc. 44, Exs. L-O).

16. On September 1, 2011, Plaintiff, for the first time, provided Busy Beaver with the 2005 through 2011 rating plan adjustments and demanded payment of a specific amount exceeding a million dollars.  (Doc. 44, Ex. Q; Ex. B at 85).

17. The stated basis for Plaintiff's demand of payment from Busy Beaver was that Busy Beaver was a successor to Cyclops.  (Doc. 44, Ex. R).

18. In or around 1988, Cyclops sold all of its shares of Busy Beaver to a company by the name of Busy Beaver Acquisition Corporation ("BBAC").  (Doc. 44, Ex. S; Ex. C at 22-23).

19. Following that sale, Cyclops and Busy Beaver operated as separate entities.  (Doc. 44, Ex. C at 23-24).

20. BBAC did not purchase any assets or divisions of Cyclops other than Busy Beaver.  (Doc. 44, Ex. S; Ex. C at 23).

## IV.    STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action.  *Celotex*, 477 U.S. at 323.  All facts and inferences must be construed in a light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . .  must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248 (1986).

## V. ANALYSIS

### A.  Choice of Law

#### 1.  *Breach of Contract*

First, the Court must determine what state law applies.  Plaintiff maintains that the laws of Illinois or Ohio apply and Defendant maintains that the laws of Pennsylvania apply.

"[A] federal court in a diversity case applies the law of the state in which it sits."  *Jim White Agency Co. v. Nissan Motor Corp.*, 126 F.3d 832, 835 (6th Cir. 1997).  The

8

Supreme Court of Ohio has adopted the Restatement of Law (Second), Conflict of Laws,

Section 187 in applying the choice of law provisions in contracts.  *Schulke Radio*

*Productions, Ltd. v. Midwestern Broad. Co.*, 453 N.E.2d 683, 686 (Ohio 1983).  If there

is a dispute as to which law governs, Section 188 of the Restatement determines which

law applies.  Under Section 188, the Court should consider: (1) the place of contracting;

(2) the place of negotiation; (3) the place of performance;[13] (4) the location of the subject

matter; and (5) the domicile, residence, nationality, place of incorporation, and place of

business of the parties.  *Ohayon v. Safeco Ins. Co. of Ill.*, 747 N.E.2d 206, 209 (Ohio

2001).  The law of the state with the "most significant relationship" to the transaction and

the parties applies.  Restatement (Second) of Conflict of Laws § 188.

      To help determine the state that has the most significant contacts, courts consider:

(1) the needs of the interstate and international systems; (2) the relevant policies of the

forum; (the relevant polices of other interested states and the relative interests of those

states in the determination of the particular issue); (3) the protection of justified

expectations; (4) the basic policies underlying the field of law; (5) certainty,

predictability, and uniformity of result, and (6) ease in the determination and application

for the law to be applied.  Restatement (Second) of Conflict of Laws § 6.

---

[13] The place of performance is "any state where [the insured] might be subject to liability." *Revco D.S. Ins. v. Gov't Employees Ins. Co.*, 791 F. Supp. 1254, 1263 n. 11 (N.D. Ohio 1991). "Generally, Ohio follows the rule that where a conflict of law issue arises in a case involving a contract, the law of the state where the contract is to be performed governs … Some courts have noted that the rationale for this rule is that the place of performance bears the most significant relationship to the contract." *Schulke Radio Productions,* 453 N.E.2d at 685 (quoted in *Gries Sports Enter., Inc. v. Modell*, 473 N.E.2d 807, 810 (Ohio 1984)).

> In insurance cases, this focus will often correspond with the Restatement's view that the rights created by an insurance contract should be determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship…to the transaction and the parties.

*Ohayon*, 747 N.E.2d at 211 (quoting Restatement (Second) of Conflict of Laws at 610, § 193).

However, an actual conflict between Ohio law and the law of another jurisdiction must exist for a choice of law analysis to be undertaken.  *Glidden Co. v. Lumbermens Mut. Cas. Co.*, 861 N.E.2d 109, 115 (Ohio 2006).  Where a party seeks to apply non-Ohio law, that party bears the burden to show the existence of a genuine conflict between Ohio law and the law of the foreign jurisdiction.  *ThorWorks Indus. v. E.I. DuPont De Nemours & Co.*, 606 F.Supp.2d 691 (N.D. Ohio 2008).  In the absence of a true conflict between potentially applicable states' laws, a court sitting in Ohio should apply Ohio law. *Elkins v. Am. Intern. Special Lines Ins. Co.*, 611 F. Supp. 2d 752, 761 (S.D. Ohio 2009).

Here, there are three sources of potentially applicable state law: (1) Illinois law may apply because Plaintiff is organized under the law of Illinois, principally operates from Illinois, and suffered damages in Illinois; (2) Pennsylvania law may apply because Busy Beaver is domiciled and operates largely from that state; and (3) Ohio law may apply as the forum state law.

Cyclops, the original party to the Policies, was a Pennsylvania corporation.  (Doc.

44, Ex. C at 19-21).  Busy Beaver and BBAC[14] are both Pennsylvania corporations, with

their headquarters in Pittsburgh.  (*Id.* at 19).  The contract was negotiated for the benefit

of these Pennsylvania entities, and the coverage provided under the Polices, which led to

Plaintiff's current claims for retrospective premiums, arose from actions and events

taking place primarily in Pennsylvania.  (*Id.* at 11, 13, 19).  The only party based in Ohio

– AK Steel – has settled and is thus not actively involved in the case.  (Doc. 41).

Accordingly, in a choice of law analysis, Pennsylvania law would apply.  However, a

choice of law analysis is unnecessary because there are no distinctions among the

---

[14]  BBAC (Busy Beaver Acquisition Corporation) was formed for the sole purpose of buying
Busy Beaver from Cyclops.  (Doc. 44, Ex. C at 12).  On September 16, 1988, Cyclops and
BBAC entered into a Stock Purchase Agreement, whereby Cyclops agreed to sell, and BBAC
agreed to buy, all the shares of Busy Beaver.  (*Id.*, Ex. S; Ex. C at 22-23).  Pursuant to the Stock
Purchase Agreement, BBAC would purchase all of Busy Beaver's stock from Cyclops, but no
part of any other division or component of Cyclops.  (*Id.*)  Cyclops and BBAC closed on the sale
of Busy Beaver on November 10, 1988.  (*Id.*, Ex. C at 22).  Following the sale of Busy Beaver to
BBAC, Cyclops continued as a separate entity, completely divested of any interest in Busy
Beaver.  (*Id.*, Ex. C at 23-24).  Thereafter, BBAC merged into Busy Beaver, and the company
continued to operate under the Busy Beaver name.  (*Id.*, Ex. C at 29-30).  All of this information
was allegedly shared with Plaintiff in 2007 by Plaintiff's asbestos defense counsel.  (*Id.*, Ex. T).
Counsel allegedly advised Plaintiff that "Busy Beaver as it existed after the sale cannot be a
'successor' to the Cyclops, Silo, and the Dixon-owned Busy Beaver entity because two bona fide
corporations existed after the asset sale."  (*Id.*)

pertinent states' contract laws which would alter the analysis.[15]

### 2. *Statute of Limitations*

Defendant maintains that Plaintiff's breach of contract claim for all premiums due in 2007 or earlier is barred by Pennsylvania's four year statute of limitations. 42 Pa. C.S. § 5525.

The Supreme Court of Ohio has adopted the Restatement (Second) of Conflict of Laws as the governing law for conflicts issues regarding statutes of limitations in Ohio.

---

[15] In order to establish a claim for breach of contract pursuant to Illinois law a plaintiff must establish the following elements: (1) the existence of a valid and enforceable contract; (2) the plaintiff's performance; (3) the defendant's breach; and (4) the plaintiff's resulting injury. *Fabrica de Tejidos Imperial, S.A. v. Brandon Apparel Group, Inc*., 218 F.Supp. 2d 974, 976 (N.D. Ill. 2002). Ohio law states: "A breach of contract occurs when a party demonstrates the existence of a binding contract or agreement; the nonbreaching party performed its contractual obligations; the other party failed to fulfill its contractual obligations without legal excuse; and the nonbreaching party suffered damages as a result of the breach." *Spectrum Benefit Options, Inc. v. Med. Mut. of Ohio*, 880 N.E.2d 926, 934 (Ohio App. 2007). Under Pennsylvania law, "[t]o successfully maintain a cause of action for breach of contract the plaintiff must establish: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract; and (2) resultant damages." *Hart v. Arnold*, 884 A.2d 316, 332 (Pa. Super. 2005).

*Cole v. Mileti*, 133 F.3d 433 (6th Cir. 1998).[16]  When a conflict arises between the

statutes of limitation of the forum state (Ohio), and another state, "[a]n action will be

maintained if it is not barred by the statute of limitations of the forum, even though it

would be barred by the statute of limitations of another state."  Restatement (Second) of

Conflict of Laws § 142(2).  Therefore, in federal court, following Ohio's adoption of the

Restatement approach, courts must apply the Ohio statute of limitations on breach of

contract "even if the action would be time-barred in another state."  *Cole*, 133 F.3d at 437

(citing *Males v. W.E. Gates & Assoc.*, 504 N.E.2d 494, 495 (Ohio Com. Pl. 1985)

(applying Ohio's fifteen-year statute of limitations to a breach of contract action that

would have been barred by Virginia's five-year statute to the case brought in Ohio)).

---

[16] However, the Supreme Court of Ohio formally adopted the 1971 version of the
Restatement, not the 1988 Revision.  *Sonic Auto., Inc. v. Chrysler Ins. Co.*, No. 1:10cv717, 2011
U.S. Dist. LEXIS 76264, at *10 (S.D. Ohio July 14, 2011).  In contrast to the 1988 Revision's
approach to determining which statute of limitations applies in the case of a conflict of laws, the
1971 version of the Restatement provides: "An action will be maintained if it is not barred by the
statute of limitations of the forum, even though it would be barred by the statute of limitations of
another state."  Restatement (Second) Conflict of Law § 142 (1971).  Thus, while the 1971
version of the Restatement allows the statute of limitations of the forum state to control, the 1988
Revision more closely tracks the Restatement's general approach for applying the law of the
state with "the most significant relationship" to the transaction.  *Id.* at 1010-11.

    At least one court in the Southern District of Ohio when directly presented with the issue
determined that the 1988 revision of Section 142 should apply.  *Curl v. Greenlee Textron, Inc.*,
404 F. Supp. 2d 1001, 1011 (S.D. Ohio Dec. 16, 2005).  Other federal courts have continued to
apply the original 1971 version of Section 142 both pre and post *Curl*.  *See, e.g., Cole v. Mileti*,
133 F.3d 433, 437 (6th Cir. 1998); *Dudek v. Thomas & Thomas Attorneys*, 702 F. Supp. 2d 826,
834 n.8 (N.D. Ohio Mar. 22, 2010).  Perhaps more significantly, most Ohio courts have
continued to apply the 1971 version of the Restatement (Second) of Conflict of Laws, Section
142.  *See, e.g., Capital One Bank, N.A. v. Rodgers*, No. CT2009-049, 2010 Ohio App. LEXIS
3723 (Ohio App. Sept. 14, 2010).  In the absence of direction from the Supreme Court of Ohio ,
this Court will follow the majority position adopted by both state and federal courts applying
Ohio law.

Accordingly, Ohio's 15 year statute of limitations applies to the breach of contract claims.[17]

## B. Breach of Contract

Under Ohio law "[a] breach of contract occurs when a party demonstrates the existence of a binding contract or agreement; the nonbreaching party performed its contractual obligations; the other party failed to fulfill its contractual obligations without legal excuse; and the nonbreaching party suffered damages as a result of the breach." *Spectrum Benefit Options, Inc. v. Med. Mut. of Ohio*, 880 N.E.2d 926, 934 (Ohio App. 2007).  Plaintiff maintains that Defendant has breached the contractual obligations of the Policies by refusing to meet the fundamental obligation of paying the premiums for the insurance coverage provided by Plaintiff.

### 1. *Confirmation Letters and Policies*

The Policies and Confirmation Letters outline the terms of the retrospective premium program.[18]  (Doc. 35 at ¶¶ 11-12).  The Policies and Confirmation letters are the contract documents that Plaintiff has placed at issue as governing this dispute.  However, none of the Confirmation Letters are actually signed by Cyclops or anyone else.  (*See,*

---

[17] Prior to June 26, 2012, the Ohio statute of limitations for a breach of contract action was 15 years.  Ohio Rev. Code § 2305.06 (2011).  However, on June 26, 2012, Ohio Senate Bill 224 revised the statute of limitations to eight years.  For breach of contract claims accruing prior to June 26, 2012, the previous 15 year statute of limitations remains in effect.  S.B. 224 at § 3.

[18] The Policies were part of a retrospective premium rating adjustment program, so Cyclops paid monthly interim installment premiums during the policy years, which premiums were estimated based on prior loses.  (Doc. 44, Ex. B at 52).

*e.g.,* Doc. 44, Ex. H; Ex. B at 63).[19]  Therefore, Plaintiff has failed to establish the specific agreed upon terms of the premium program.[20]

The combination of uncertified Policies and unexecuted Confirmation Letters illustrates that Plaintiff has not established all of the terms of the contract and is not entitled to relief.

### 2. *Successor Liability*

Even if this Court were to conclude that Plaintiff established the specific terms of the contract, Defendant was never bound to the contract between Plaintiff and Cyclops because Defendant is not a successor.  Defendant's insured status derives solely from its subsidiary relationship to Cyclops.  When Cyclops negotiated the Policies, it contractually arranged to insure all of its subsidiaries.  The definition of "named insured" includes all subsidiaries of Cyclops.  (Doc. 44, Ex. E).  Therefore, as part of the bargain negotiated between Plaintiff and Cyclops, Plaintiff was contractually obligated to insure that Busy Beaver and Cyclops were contractually obligated to pay for the insurance.

---

[19]  Q:  By the way, the insurance policies, are they all certified insurance policies that have been provided?
A.  I don't know.
Q.  Do you know if they are complete?
A.  From what I see and what I can tell, yes.  But if they're not certified, I wouldn't say yes for a fact.
(Doc. 44, Ex. B at 27).

[20]  Plaintiff did submit the written Policies themselves and the affidavit of Daniel Peterson attesting to the terms of the Polices.  (Doc. 48).  Mr. Peterson is a Legal Account Specialist in the Worldwide Billing and Collections Department of Continental Casualty Company ("CNA Insurance").  Plaintiff is an insurance carrier which operates under the CNA service mark.  (*Id.* at ¶ 1).

However, Defendant is not responsible for the retrospective premiums on the basis of successor liability because it is not a successor to Cyclops.  The sale or transfer of all the assets of one company to another does not render the purchasing or receiving company responsible for the debts and liabilities of the selling company.  *Conr'l Ins. Co. v. Schneider, Inc.*, 873 A.2d 1286, 1291 (Pa. 2005).  For a purchaser to even have the potential to be a successor, there must be a sale or transfer of *all* the assets of the selling company.  *Id.*[21]  The sale of Busy Beaver by Cyclops to BBAC was not a sale or transfer of all of Cyclops' assets.  Cyclops simply sold Busy Beaver.  Following the sale, Cyclops continued to operate.  (Doc. 44, Ex. C at 23-24).  BBAC did not purchase any assets of Cyclops other than the stock of Busy Beaver.  (*Id.* at 23-24).  Busy Beaver then re-emerged as an independent company rather than a subsidiary of Cyclops.  Busy Beaver became a successor of itself, not a successor of Cyclops which continued as a separate entity.

Named insured status alone is not sufficient to create a contractual obligation to pay premiums.  An express contractual promise to pay is required.[22]  For example, in *Am. Mut. Liability Ins. Co. v. Bollinger Corp.*, 402 F.Supp. 1179 (W.D. Pa. 1975), the court

---

[21] *See also Flaugher v. Cone Automatic Mach. Co.,* 507 N.E.2d 331, 338-339 (Ohio 1987) (the well-recognized general rule of successor liability provides that the purchaser of a corporation's assets is not liable for the debts and obligations of the seller corporation).

[22] Plaintiff's citation to *Bruder v. County Mut. Ins. Co.*, 620 N.E.2d 355, 365 (Ill. 1993), is inapposite.  Plaintiff quoted the dissenting opinion for the general proposition that named insureds are policyholders.  The issue in *Bruder* was whether two policies could be aggregated so as to favor a spouse and daughter.  The case did not deal with premium payments and its analysis has no application here.

considered a similar scenario where a primary company generated insurance policies and its affiliated corporations reimbursed the parent by way of intra-corporate accounting. The insurance company always looked to the primary company for payment of premiums, irrespective of the naming of more than one company as insureds.  When the primary company stopped paying premiums for a subsidiary company that had been sold, the insurance carrier sued the primary company.  The court held that by virtue of the course of conduct between the parties, the primary company was responsible to the carrier for premiums generated by its wholly owed subsidiaries.  *Id.* at 1185.  The court found that the primary company was solely liable for the premiums, rejecting the primary company's argument as to several liability between it and other affiliated companies.  *Id.* at 1186.

Here, there is no evidence that Defendant is jointly and/or severally liable with Cyclops or its successor, AK Steel Corporation.  Only Cyclops (or any successor thereof, *i.e.*, AK Steel) is responsible for premiums due.[23]

### 3.  Contract Terms

The terms of the contract do not include an express contractual promise for Defendant to pay.  Cyclops is the only named entity listed on the declarations page. (Doc. 44, Ex. A).  Cyclops, through its broker, negotiated the contract and all the terms of the insurance program.  (Doc. 44, Ex. B at 23).  Cyclops is identified as the primary

---

[23]  *See also Zurich Am. Ins. Co. v. Watts Regulator Co.*, 860  F.Supp.2d 78 (D. Mass 2012) (finding the parent company responsible for the premium payments where insurance carrier defending the subsidiary sued the subsidiary for unpaid premiums).

named insured.  (*Id.*, Ex. A).  Only Cyclops' name and address are identified and Cyclops paid all the premiums.  (*Id.*, Ex. B at 23).  Cyclops was the only entity making any adjusted premium payments, despite the fact that Busy Beaver remained a subsidiary until 1988.  Plaintiff provided the required annual premium adjustment information directly to Cyclops.  (*Id.* at 70, 76-77).

When Plaintiff and Cyclops entered into the insurance contracts, Plaintiff planned for the contingency that Cyclops might not be able to make payments and contractually required Cyclops to post a bond that would be collected in the event Cyclops did not pay the premium.  (Doc. 44, Ex. B at 53-58; Ex. I).  Even after the asbestos litigation began more recently in approximately 2005, Plaintiff's invoices were directed to Cyclops, identifying Cyclops' address and Cyclops as the account name.  (*Id.*, Ex. L).  The invoices were stated in terms of a lump sum to be paid by Cyclops and not broken down further with an amount due from each insured.  (*Id.*)

Plaintiff did not negotiate the right to seek contribution or payments from any of Cyclops' subsidiaries.  The Confirmation Letters and their attachments indicate that premium payments shall be paid by Cyclops.  For example, with respect to interim installment premiums, the 1981 letter states: "Interim installment premiums, as hereinafter set forth, shall be paid by Cyclops Corporation to CNA no later than the due date indicated.  Payments to be sent to:" (Doc. 44, Ex. H).  With respect to adjustments, Plaintiff retained the right to bill Cyclops, and no other entity: "However, if at any time prior to the first retro adjustment the indicated retro subject premium exceeds the

18

collected retro subject premium, CNA retains the right to immediately bill Cyclops Corporation for the difference, subject to the plans standard premium." (*Id.*, Ex. F). Although the language varies slightly in the unexecuted Confirmation Letters for different years, all of the letters contain some type of language allowing Plaintiff to pursue premium payments from Cyclops. (*Id.*)

Accordingly, Defendant was not contractually bound by the Policies or Confirmation Letters.

### 4. *Course of Conduct*

A court may look to the parties' course of conduct as evidence of their construction of a contract when the contract language is unclear. *Shifrin v. Forest City Ent., Inc.*, 597 N.E.2d 499, 501 (Ohio 1992). Where the contract language is clear and unambiguous, however, courts may not create a new contract by finding an intent not expressed by the contractual language. *Id.*[24]

The overall "course of conduct" during the contract period demonstrates that Plaintiff had virtually no dealings with Defendant in relation to the insurance program or collection of premiums. For example, even after Plaintiff provided a defense and indemnity to Defendant in the asbestos litigation between 2005 and 2009, it sent no

---

[24] Plaintiff argues that Defendant has failed to demonstrate any ambiguity in the policies meriting consideration of extrinsic evidence as to the parties' course of performance or course of dealing, and, therefore, the Court should exclude any extrinsic evidence. However, this Court finds that ambiguity does exist, specifically because none of the Policies or Confirmation Letters are signed or certified. While consideration of the parties' course of performance is unnecessary given this Court's previous findings, the parties' course of performance further supports a finding that Defendant is not liable under the Policies.

premium adjustments and no bills to Defendant.  When Plaintiff advised Defendant that the insurance was retrospectively rated, Defendant inquired further about the program and requested premium adjustment information from Plaintiff.  Plaintiff refused to provide information directly to Defendant, stating:  "With respect to the premium payment and premium adjustment information that you requested, CNA believes that it would be more appropriate for you to request that information from A.K. Steel, the company that is the successor to Cyclops Corporation.  The contact information for A.K. Steel is as follows:"  (Doc. 50, Ex. K).  Accordingly, Plaintiff has never treated Defendant as having rights and obligations identical to that of Cyclops. [25]

Moreover, premiums were adjusted in 2009, 2010, and 2011, but no adjustment information was ever provided to Defendant, and Plaintiff's invoices were addressed only to Cyclops.  It was not until September 1, 2011, just months before this lawsuit was filed, that Plaintiff provided Defendant with the 2005-2011 rating plan adjustments and demanded millions of dollars in adjusted premiums from Defendant.  (Doc. 44, Ex. Q).

---

[25]  Plaintiff cites a number of cases regarding modification of the Policies by way of a perceived "course of conduct."  However, these cases are both factually distinguishable and largely irrelevant.  *Zurich Am. Ins. Co. v. Watts Regulator Co.*, 860 F. Supp.2d 78, 85 (D. Mass. 2012), stands for the proposition that Cyclops remains liable for payment of retrospective premiums to Plaintiff.  Plaintiff does not refute this – but contends that it bears no relation to its ability to enforce the Policies and collect from Defendant.  The court in *Zurich* explicitly reserved judgment on the issue of the former subsidiary's liability.  *Liberty Mut. Ins. Co. v. United Techs. Corp.*, 15 Mass. L. Rep. 629 (Mass. Super. 2003), stands for the same fundamental proposition as *Zurich* and is not applicable to this case.  Specifically, the court held that a former parent corporation liable for the retrospective premium obligations incurred by its former subsidiary, but the court was silent as to the former subsidiary's liability for the same premium obligations. *Id.* at 17-18.

The overall course of conduct demonstrates that Plaintiff had virtually no dealings with Defendant and Plaintiff never treated Defendant as if it had rights or obligations like Cyclops.

### 5. Adjustments

Even if Defendant made an express contractual promise to pay, Plaintiff breached its agreement with Cyclops by failing to make annual premium adjustments from 2005 to 2009, and when Plaintiff began making adjustments in 2009, it failed to provide Defendant with the adjustment information until September 2011.  Plaintiff's annual calculations and sharing of the information with Cyclops or whomever it thought responsible for payment was a material aspect of the retrospective premium plan. Plaintiff's breach relieves Defendant of any obligation to pay.

Plaintiff claims that its failure to calculate retrospective premiums in a timely manner is not a material breach and therefore does not excuse Defendant from performance.  Performance under a contract is excused by a counter-party's failure to perform only where that counter-party's breach of contract is material.  *Freeman Indus. Prods. v. Armor Metal Group*, 952 N.E.2d 543, 552 (Ohio App. 2011).  The Court looks to the Second Restatement of Contracts to determine if the counter-party's breach was material.  *Rhodes v. Rhodes Indus., Inc.*, 595 N.E.2d 441, 447 (Ohio App. 1991).  The Restatement provides the following factors to determine whether a counterparty's breach was material and therefore excuses continued performance:

(1) The extent to which the injured party will be deprived of the benefit which he reasonably expected;

(2) The extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(3) The extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(4) The likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(5) The extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Rest. 2d of Contracts § 241.

In determining whether a certain breach is material, courts consider whether the non-breaching party is deprived of an expected benefit and whether the breaching party can cure the breach. *Widmer Eng. Inc. v. Dufalla*, 837 A.2d 459, 467-68 (Super. Pa. 2003).[26] Although ordinarily a question for the jury, the materiality of a particular breach can be decided as a matter of law, particularly where the evidence of the breach is clear, uncontradicted, and indisputable. *Enrlich v. U.S. Fidelity & Guar. Co*., 51 A.2d 794 (Pa. 1947).[27]

The purpose of the annual premium adjustment calculations was to provide both contracting parties with financial data as to the cost of the premiums for each year and the

---

[26] *See also Ferrando v. Auto-Owners Mut. Ins. Co*., 781 N.E.2d 927, 933 (Ohio 2002).

[27] Plaintiff does not contest that it failed to provide Defendant with the rating plan adjustments until September 1, 2011.  (*See* Section III at 16).

ability to protect future premiums and engage in financial planning.  The insured was to have the ability to challenge the retrospective premium calculations by having its own audit performed to resolve any discrepancies in the calculations and sharing of that information with Cyclops, or whomever it thought responsible for payment was a material aspect of the premium plan.  Plaintiff's failure to make timely adjustments and share that information with Defendant deprived Defendant of the opportunity to make plans for its financial future.  This included depriving Defendant of the opportunity to consider whether to seek coverage if the anticipated premium adjustments financially outweighed the anticipated indemnity and defense benefits.  Instead, Plaintiff waited until fourteen years of premium adjustments had piled up, and announced that millions of dollars were due, before demanding payment from Defendant.

Accordingly, the Court finds that even if the terms of the contract were properly established and Defendant was a successor under the policy, Plaintiff's material breach relieves Defendant of any obligation to pay.[28]

---

[28] Plaintiff maintains that to the extent Defendant alleges that it is excused from performance of its obligations due to Plaintiff's purportedly "material" breach, Defendant is further precluded from making such an assertion under the unclean hands doctrine.  Defendant knew when it submitted its claims for coverage that it was no longer a subsidiary of Cyclops and that Cyclops was no longer a functioning entity but failed to alert Plaintiff to any of these critical facts. Accordingly, Plaintiff maintains that Defendant cannot now claim, in good faith, that it should be excused from its contractual obligation to pay for its insurance coverage.  "In order to have any standing to successfully assert an equitable defense one must come with clean hands, and if he has violated conscience or good faith or has acted fraudulently, equitable release in defenses are not available to him."  *City of Kettering v. Berger*, 448 N.E.2d 458, 466 (Ohio App. 1982). "[U]nclean hands are not to be lightly inferred.  They must be established by clear, unequivocal and convincing evidence."  *Hoover Transp. Servs., Inc. v. Frye*, 77 Fed. Appx. 776, 784 (6th Cir.

### C. Unjust Enrichment

Plaintiff contends, as an alternative to its breach of contract claim, that Defendant can be held liable for the retrospective premiums on the basis of unjust enrichment.

Unjust enrichment is an equitable doctrine that allows recovery where a Plaintiff can establish: "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment." *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984).

Here, Plaintiff seeks recourse under the terms of written insurance policies and Confirmation Letters.  The provision of insurance coverage to Cyclops and other entities arose from the Policies.  The retrospective premiums exist only through the terms of the Policies and Confirmation Letters.  Plaintiff has recourse through the terms of those agreements against the named insured responsible for the premiums – Cyclops (or its successor-in-interest AK Steel).

---

2003).  "For the doctrine of unclean hands to apply, the offending conduct must constitute reprehensible, grossly inequitable, or unconscionable conduct, rather than mere negligence, ignorance, or inappropriateness ….  Furthermore, 'the unclean hands doctrine should not be imposed where a party has legal remedies available to address an opposing party's asserted misconduct.'"  *Deutsche Bank Nat'l Trust Co. v. Pevarski*, 932 N.E.2d 887, 894 (Ohio App. 2010).

The Court finds that: (1) Plaintiff has legal remedies available under the Policies and therefore the equitable doctrine does not apply; (2) given the facts, specifically that Plaintiff waited fourteen years to demand payment, Plaintiff does not come with clean hands; and (3) Plaintiff has failed to establish that Defendant's conduct was reprehensible, grossly inequitable, or unconscionable.

Accordingly, the unclean hands doctrine does not apply.

Additionally, Defendant is not obligated to pay retrospective premiums by virtue of being a beneficiary of the Policies negotiated between Plaintiff and Cyclops. Numerous courts have held that a party is not obligated to pay premiums simply by virtue of being named an insured or receiving coverage under an insurance policy. It would distort the analysis and holdings of these cases to recognize an unjust enrichment theory when no direct contractual claim exists.[29]

The Confirmation Letters were addressed to Cyclops, refer to billing Cyclops, and allow Plaintiff to pursue premium payments from Cyclops. (Doc. 44, Ex. F). There is no similar language by which Plaintiff contractually arranged for itself to directly pursue any subsidiary of Cyclops for premium payments. Moreover, the language in the Confirmation Letters was entirely consistent with the practice and course of dealing between Plaintiff and Cyclops for decades. Where there is a specific contract governing the relationship of the parties, the doctrine of unjust enrichment does not apply. *See, e.g., Aultman Hosp. Assn. v. Cmty. Mut. Ins. Co.*, 544 N.E.2d 920, 924 (Ohio 1989) (generally there can be no recovery on an unjust enrichment claim if there is an express contract

---

[29] The cases Plaintiff relies on are not applicable. *See, e.g., Hartford Acc. & Indem. Co. v. L&T, Inc.*, 455 So.2d 1074 (Fl. Ct. App. 1984) (in dicta the court repeated the general rule that one who receives the benefits under a contract cannot escape the burdens and at least on the facts as presented to the court there was a *prima facie* obligation on the part of the affiliate company to pay premiums when the settlement was reached); *St. Paul Fire & Marine Ins. Co. v. Schilli Trans. Servs., Inc.*, No. 2:08cv176, 2012 U.S. Dist. LEXIS 160904 (N.D. Ind. Nov. 9, 2012) (concerned whether separate corporations who were billed separately for premiums, who had separate finances, and who separately paid their premiums, were nonetheless subject to joint liability to the insurer for the deductible on claims submitted under the policy – however, the policy explicitly named each of the separate corporations as named uninsureds and indicated that the insurer would treat each named insured as if it were the only named insured).

covering the same subject); *Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa. Super 1999)

("We may not make a finding of unjust enrichment…where a written or express contract

between parties exists.").

Plaintiff negotiated an insurance contract with Cyclops for the provision of

insurance coverage to Cyclops and all of its subsidiaries.  Pursuant to that contract, as

confirmed by the Confirmation Letters and the course of dealing between the parties,

Cyclops was the only insured responsible for premium payments.

Accordingly, Plaintiff has no viable unjust enrichment claim as a matter of law.

## VI.   CONCLUSION

Accordingly, for the foregoing reasons, there being no genuine issue as to any

material fact, and Defendant being entitled to judgment as a matter of law, Plaintiff's

motion for summary judgment (Doc. 45) is **DENIED** and Defendant's motion for

summary judgment (Doc. 44) is **GRANTED.**  The Clerk shall enter judgment

accordingly, and this case shall be **CLOSED** in this Court.

**IT IS SO ORDERED**.


Date:  8/27/13                                              *s/ Timothy S. Black*
                                                            Timothy S. Black
                                                            United States District Judge